**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DONNITTA SINCLAIR, mother of deceased Horace Lorenzo Anderson, Jr., individually, | No. 21-35975 |
| | D.C. No. 2:21-cv-00571-JCC |
| *Plaintiff-Appellant,* | |
| v. | OPINION |
| CITY OF SEATTLE, a Municipality, | |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted October 17, 2022
Seattle, Washington

Filed March 1, 2023

Before:  Richard C. Tallman, Ryan D. Nelson, and Danielle
J. Forrest, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Judge R. Nelson

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal for failure to state a claim of an action brought against the City of Seattle pursuant to 42 U.S.C. § 1983 by Donnitta Sinclair, whose nineteen-year-old son was shot to death in 2020 in the Capitol Hill Occupied Protest ("CHOP") zone, an area that the Seattle Police Department and the Mayor of Seattle had surrendered to protestors.

Sinclair alleged that the City's actions and failures to act regarding CHOP created a foreseeable danger for her son, that the City was deliberately indifferent to that danger, and that as a result, the City was liable for violating her Fourteenth Amendment substantive due process right to the companionship of her adult son.

The panel stated that, unlike almost every other circuit, this circuit recognized Sinclair's substantive due process right to the companionship of her adult son. And Sinclair properly alleged that the City acted with deliberate indifference to the danger it helped create, which caused her son's death. It was self-evident that the Seattle Police Department's wholesale abandonment of its East Precinct building, combined with Mayor Durkan's promotion of CHOP's supposedly festival-like atmosphere, would create a toxic brew of criminality that would endanger City residents. But the danger to which the City contributed was

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

not particularized to Sinclair or her son, or differentiated from the generalized dangers posed by crime, as this circuit's precedent required. Because the City's actions were not directed toward Sinclair's son and did not otherwise expose him to a specific risk, the connection between Sinclair's alleged injuries and the City's affirmative actions was too remote to support a § 1983 claim.

Concurring, Judge R. Nelson stated that this circuit has created a split with other circuits by recognizing a substantive due process right to the companionship of one's adult children. In establishing the right on which Sinclair's claim depended, this circuit's precedent failed to engage in the proper analysis required by *Washington v. Glucksberg*, 521 U.S. 702 (1997). Had this circuit done so, it should have reached the conclusion that sister circuits already have: There is no constitutional right to recover for the loss of Sinclair's companionship with her adult son. Judge R. Nelson stated that this circuit should correct its prior erroneous precedent en banc.

---

## COUNSEL

Philip A. Talmadge (argued) and Aaron P. Orheim, Talmadge/Fitzpatrick, Seattle, Washington; Mark Lindquist, Mark Lindquist Law, Tacoma, Washington; for Plaintiff-Appellant.

Kerala Cowart (argued) and Jessica Lynn Zornes Leiser, Assistant City Attorneys; Ann Davison, Seattle City Attorney; Seattle City Attorney's Office; Seattle, Washington; for Defendant-Appellee.

## OPINION

R. NELSON, Circuit Judge:

During the George Floyd protests in the summer of 2020, the Seattle Police Department and the Mayor of Seattle took the unprecedented step of surrendering an entire precinct and a large area of the surrounding neighborhood to protestors for a month, who declared it the Capitol Hill Occupied Protest ("CHOP"). Top City of Seattle ("City") officials, including members of the City Council, were in their thrall, supporting and encouraging CHOP, with the mayor calling it a reprise of "the summer of love," despite growing evidence of its lawlessness and danger—and a mounting body count. Donnitta Sinclair, the mother of a nineteen-year-old son with special needs who was shot to death within CHOP, brought this action to recover damages for her loss of companionship with her son.

We are sympathetic to Sinclair's effort to hold the City accountable for the death of her son. Unlike almost every other circuit, we recognize her substantive due process right to the companionship of her adult son. And Sinclair alleges that the City acted with deliberate indifference to the danger it helped create, which caused her son's death. But the danger to which the City contributed was not particularized to Sinclair or her son, or differentiated from the generalized dangers posed by crime, as our precedent requires. We therefore affirm the district court's dismissal of Sinclair's suit for failure to state a claim for relief under 42 U.S.C. § 1983.

I

In the summer of 2020, Seattle residents joined nationwide protests following George Floyd's murder in Minneapolis.  Sinclair's allegations[1] against the City are astounding.  On June 8, 2020, as confrontations escalated between protestors and police officers, the City withdrew all police officers from the Seattle Police Department's East Precinct building, which served the Capitol Hill neighborhood.  Protesters used barricades left behind by the Seattle Police Department ("SPD") to block traffic and "seized a roughly sixteen-block area of Capitol Hill, including Cal Anderson Park."  They declared it to be autonomous from City governance, calling it the CHOP zone.

Sinclair alleges that CHOP participants were seen carrying guns at all hours and that violence, vandalism of homes and businesses, open drug use, and other crimes proliferated in the now lawless area.  According to Sinclair, the City did not have an effective plan to provide police protection or emergency services in the CHOP zone, but instead it provided occupiers with portable toilets, lighting, and other support, including modifying emergency response protocols of SPD and the Seattle Fire Department ("SFD").  On June 11, 2020, SPD Chief Carmen Best allegedly admitted that "response times for crimes in progress were over 15 minutes, about three times as long as the average."  That same day, in an interview with CNN, Mayor Jenny

---

[1] "When reviewing the dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), we take all factual allegations set forth in the complaint as true, construed in the light most favorable the plaintiff."  *San Carlos Apache Tribe v. Becerra*, 53 F.4th 1236, 1239 n.2 (9th Cir. 2022).

Durkan labeled CHOP a "block party" and characterized the events as a "summer of love." Councilmember Kshama Sawant also publicly described CHOP as a "peaceful" occupation even after it became violent.

Sinclair is the mother of Horace Lorenzo Anderson, Jr., a nineteen-year-old with special needs. On or about June 20, Anderson visited CHOP and encountered Marcel Long. The two had a history of antagonism. According to Sinclair, Long believed CHOP was a "no-cop" zone, and he was carrying a gun. After speaking with each other, Long pulled out the gun. Anderson then walked away while Long was briefly held back by others. According to Sinclair, Long broke away and caught up to Anderson, shooting him at least four times.

CHOP participants carried Anderson to a "medical tent" they had erected in an outdoor area just outside of Cal Anderson Park. Anderson apparently had a pulse when they laid him down on a table. SFD allegedly had an ambulance staged just a block and a half from Anderson's location. A man implored the paramedics to help Anderson, but the medics were apparently waiting for a green light from SPD; meanwhile, SPD was confused about the paramedics' location. The miscommunication caused a response delay of around 20 minutes before first responders finally arrived to treat Anderson.

By the time police and fire officials entered the area, CHOP participants had transported Anderson to nearby Harborview Medical Center in a pick-up truck where he was pronounced dead at 2:53 a.m.

Before the establishment of CHOP, there had been no homicides in the area for six months, and there were only three homicides in the entire Capitol Hill area in 2019. By

contrast, there were allegedly several shootings, one other homicide, and numerous other crimes, including robberies and sexual assaults, in just nine days in CHOP.

On July 1, Mayor Durkan finally issued an executive order to restore official control over CHOP, including retaking the SPD East Precinct. In reestablishing law and order, there was no significant violence or serious resistance offered by occupants.

After burying her son, Sinclair brought a single 42 U.S.C. § 1983 claim in her individual capacity as the mother of the decedent, seeking to hold the City liable for violating her Fourteenth Amendment substantive due process right to the companionship of her adult son.[2] Sinclair alleges that the City's actions and failures to act regarding CHOP created a foreseeable danger for her son and that the City was deliberately indifferent to that danger.

The City moved to dismiss the amended complaint for failure to state a claim. A magistrate judge recommended dismissal, over Sinclair's objection. The district court adopted the magistrate judge's recommendation and dismissed the case with prejudice. Sinclair now appeals.

II

We review de novo the district court's decision to grant a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *Ballinger v. City of Oakland*, 24 F.4th 1287, 1292 (9th Cir. 2022). We take all allegations of fact as true and construe them in the light most favorable to the nonmoving

---

[2] Sinclair is not suing on behalf of her deceased son as personal representative of his estate. Her son's estate's claims against the City were settled in a separate action.

party. *See id*.   Conclusory allegations cannot defeat a motion to dismiss.  *See Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 946 (9th Cir. 2021).   Dismissal is appropriate if the complaint fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim.  *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

The district court had federal question jurisdiction over Sinclair's § 1983 claim against the City pursuant to 28 U.S.C. § 1331.   We have jurisdiction over Sinclair's timely appeal of the district court's final order under 28 U.S.C. § 1291.

### III

### A

The Civil Rights Act codified in 42 U.S.C. § 1983 provides a cause of action against state officials who deprive a plaintiff of her federal constitutional rights.   Sinclair alleges that the City violated her Fourteenth Amendment substantive due process right to companionship with her son by creating an actual and particularized danger to him and by acting with deliberate indifference towards saving his life.

The Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. For more than a century, the Supreme Court has recognized parental constitutional rights to the care, custody, and control of minor children.  *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (describing the right to "establish a home and bring up children" as among the "privileges long recognized at common law as essential to the orderly pursuit

of happiness by free men"); *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion); *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 27 (1981); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–19 (1984).   In our circuit, we have understood these cases to have recognized "a 'fundamental liberty interest' in 'the companionship and society of [one's] child' for which '[t]he state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. §] 1983.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 685 (9th Cir. 2001) (quoting *Kelson v. City of Springfield,* 767 F.2d 651, 654–55 (9th Cir. 1985), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)).

But the Supreme Court has not decided whether parental rights to the companionship of a child retains its constitutional dimension after the child reaches the age of majority; its cases all concerned minor children.   Of the circuits who have expressly considered the question, only the Tenth Circuit has held that the right extends to adult children.   *Compare Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8–9 (1st Cir. 1986), *McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003), *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005), *overruling Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984), *Robertson v. Hecksel*, 420 F.3d 1254, 1259–60 (11th Cir. 2005), *and Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001), *with Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1188–89 (10th Cir. 1985) (recognizing a constitutionally protected liberty interest in relationship with adult son).   But even the Tenth Circuit relied mainly on the First Amendment right to intimate association, not the Fourteenth Amendment, to define the scope of that right.   *See id.* at 1190 nn. 6–7; *cf. Robertson*, 420 F.3d at 1258 n.3 ("The Tenth Circuit has

recognized a parent's constitutionally protected liberty interest in companionship with her adult son, but did so under the First Amendment's right of intimate association, which contains 'an intrinsic element of personal liberty.'"). And the Tenth Circuit declined to find a deprivation of the right where the state action was not intentionally directed toward the associational right. *See Trujillo*, 768 F.2d at 1190 n.7; *see also Russ*, 414 F.3d at 787.

That makes us an outlier. Although we have never expressly expounded on the question, we have recognized implicitly that parents maintain a constitutionally protected liberty interest in the companionship of their adult children. And our case law has assumed that the right may be violated even when the relationship is not the target of state action. For example, in *Porter v. Osborn*, plaintiffs brought a Fourteenth Amendment claim after their adult son was fatally shot in an encounter with Alaska State Troopers. 546 F.3d 1131, 1132 (9th Cir. 2008). We simply cited the broad principle that a parent has a constitutionally protected liberty interest in the companionship of his or her child and scrutinized the scope of the right no further. *Id.* at 1136. We also did not question plaintiffs' asserted rights in *Strandberg v. City of Helena*, 791 F.2d 744, 748 n.1 (9th Cir. 1986), and *Moreland v. Las Vegas Metropolitan Police Department*, 159 F.3d 365, 371 (9th Cir. 1998).

Whether those prior panels adopted the rule sub-silentio, or overlooked it by mistake, we cannot say. But by now it is settled in our case law, and we are bound by our precedent. Given the similarities between the facts in *Porter* and Sinclair's claim, at least in our circuit, Sinclair possesses a constitutional right to the companionship of her adult son on which her claim depends. We thus turn to the question

whether Sinclair has alleged that the City's actions with respect to CHOP violated her substantive due process rights.

B

Although Sinclair brings this action to vindicate an alleged deprivation of her own right, *see Kelson*, 767 F.2d at 654 n.2, her theory of liability is a derivative of her son's underlying right: She alleges that the City violated her right to the companionship of her son by violating his right to be free from state-created danger. Generally, "members of the public have no constitutional right to sue state [actors] who fail to protect them against harm inflicted by third parties." *L.W. v. Grubbs* (*Grubbs I*), 974 F.2d 119, 121 (9th Cir. 1992) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). One exception to that rule is the state-created danger doctrine, *id*., under which "the state may be constitutionally required to protect a plaintiff that it affirmatively places in danger by acting with deliberate indifference to a known or obvious danger." *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019) (cleaned up).

To succeed on a state-created danger claim, a plaintiff must establish that (1) a state actor's affirmative actions created or exposed him to "an actual, particularized danger [that he] would not otherwise have faced," (2) that the injury he suffered was foreseeable, and (3) that the state actor was deliberately indifferent to the known danger. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133–34 (9th Cir. 2018) (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006)).

The City challenges the first and third elements only. It does not contest that its actions resulted from municipal

policy.**3**  Given the roles of the chief of police, the mayor, and the city councilwoman, the facts alleged strongly establish the municipal policy that underlies the City's allegedly tortious behavior establishing this element of the lawsuit under the Civil Rights Act.  Sinclair properly alleges that the City acted with deliberate indifference.  Sinclair fails, however, to allege that the City created a danger that was both actual and particularized to her or her son.

1

"[O]nly official conduct that 'shocks the conscience' is cognizable as a due process violation."  *Porter*, 546 F.3d at 1137.  On the record alleged here, where the official conduct follows an opportunity for actual deliberation, that standard is met by a showing that the defendant acted with deliberate indifference.  *Id*. (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)).  Thus, to make out a successful claim under the state created danger doctrine, a plaintiff must allege facts sufficient to establish that the defendant acted "with 'deliberate indifference' to a 'known or obvious

---

[3] To prevail on a municipal liability claim, a plaintiff must show that the city "had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation he suffered."  *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  "To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).  "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the [government] actor knows or reasonably should know would cause others to inflict the constitutional injury."  *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)).

danger.'" *Hernandez*, 897 F.3d at 1133 (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011)). This is a "stringent standard of fault." *Id*. at 1135. The defendant "must 'recognize[] the unreasonable risk and actually intend[] to expose the plaintiff to such risks without regard to the consequences to the plaintiff.'" *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1158 (9th Cir. 2021) (alterations in original) (quoting *L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996)). "Ultimately, a state actor needs to know that something is going to happen but ignore the risk and expose the plaintiff to it." *Id*. at 1158–59 (cleaned up).

Sinclair's allegations support the strong inference that the City acted with deliberate indifference toward the dangers of permitting and encouraging establishment of the CHOP zone. It is self-evident that the SPD's wholesale abandonment of its East Precinct, combined with Mayor Durkan's promotion of CHOP's supposedly festival-like atmosphere, would create a toxic brew of criminality that would endanger City residents. In particular, Sinclair's allegations that "City Council Member Kshama Sawant publicly and recklessly framed CHOP as a 'peaceful' occupation even after it became violent," and that Police Chief Carmen Best wondered aloud after a second homicide in CHOP "why we could continue to allow this to happen," all support the inference that City officials knowingly exposed the public to a danger against which the officials did almost nothing to protect against. Freedom to assemble and to speak are constitutionally protected; violence is not.

The district court was correct, however, in holding that Sinclair's allegations about the City's response after Anderson had been shot do not show deliberate indifference. Sinclair does not dispute that medics tried to provide Anderson care and that the City did not prohibit them from

doing so.   And she agrees that their delayed response stemmed from a miscommunication about whether they were approved to enter the CHOP zone.   Indeed, SFD had even positioned an ambulance a block and a half away from the CHOP medical tent where Anderson was carried.   Had the City been deliberately indifferent to Anderson's particular plight, they would have ignored CHOP participants' pleas for help altogether.   They did no such thing.

In sum, Sinclair has properly alleged that the City was deliberately indifferent to the dangers of CHOP, but not deliberately indifferent in its response to Anderson's ensuing injuries or in the provision of medical care to him.

2

For a plaintiff to prevail on a state-created danger claim, the government must "affirmatively create[] an actual, particularized danger [that the plaintiff] would not otherwise have faced."   *Kennedy*, 439 F.3d at 1063.   Sinclair's allegations support a conclusion that the City created an actual danger, but not a particularized one.

a

Accepting Sinclair's allegations as true, Sinclair shows that the City affirmatively created the actual danger Anderson—and by extension Sinclair—faced.   Most relevant, Sinclair alleges that the City (1) left behind barriers the CHOP occupiers used to block streets off from general traffic and emergency responders; (2) provided portable toilets, lighting, and other support to the occupiers that allowed the lawless violence to persist; and (3) lured visitors to CHOP with promises of safety and a block-party atmosphere.   Construing these allegations in the light most

favorable to Sinclair, it is plausible that these actions, combined with the City's withdrawal of law enforcement from CHOP, incubated a more lawless and violent environment compared to the status quo. Sinclair argues that "[h]ad the City not provided barricades and other material support to CHOP . . . . people like [Anderson]'s murderer would not have been emboldened to undertake in criminal activity." Her allegations, if proven, support that conclusion.

The City responds that this case is similar to *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007), in which we held the City did not create a danger. In *Johnson*, in response to growing violence at a Mardi Gras festival, the City of Seattle altered its crowd control plan for riot officers monitoring the event from one focused on confronting problematic behavior to one in which officers would remain on the periphery of the crowd. *Id*. at 637. The assistant police chief in charge ordered the change because he "determined that ordering police officers to enter into the crowd, or any attempts by the police to disperse it would incite greater panic and violence, making the situation worse." *Id*. Members of the crowd who were then assaulted by rogue revelers brought a § 1983 action against the City. *Id.* We held that the City had not engaged in affirmative conduct that "enhanced the dangers the . . . [p]laintiffs exposed themselves to by participating in the Mardi Gras celebration." *Id*. at 641. The City's decision to switch its tactical plan "did not place [the plaintiffs] in any worse position than they would have been in had the police not come up with any operational plan whatsoever." *Id.*

Here, Sinclair alleges more than the sort of police withdrawal to alleviate escalating violence that we considered in *Johnson*. She alleges the City affirmatively provided traffic barriers, lighting, and toilets to encourage

the occupation, and portrayed CHOP as a fun, peaceful, cop-free protest, which further incited lawlessness in the area but nonetheless attracted Anderson to CHOP.   Sinclair also alleges that the City support for CHOP extended for about a month after it became clear that the City's policies were fostering greater unchecked violence.  The City's actions were thus deliberate and not passive or neutral as in *Johnson.* Sinclair's allegations against the City go further and support the inference that the City's actions increased the level of danger CHOP posed to Anderson above the counterfactual baseline level of danger that would have existed without its intervention: It was the City's creation of an opportunity for uncontrolled lawlessness, not just the City's failure to intervene, that endangered Anderson's, and by extension Sinclair's, rights.

b

While Sinclair adequately alleges that the City created, or at least significantly contributed to, the danger her son faced, she fails to allege that the danger was sufficiently particularized to support a § 1983 claim.

A "particular" danger is a danger "of, relating to, or being a single person or thing." *Particular*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003).   A "particularized" danger, naturally, contrasts with a general one.  But any danger the City created or contributed to by enabling the CHOP zone affected all CHOP visitors equally; the danger was not specifically directed at Sinclair or Anderson.  That is, the dangers that Anderson faced as a result of the City ignoring the lawlessness and crime occurring in CHOP were the same as anyone else; the City did not create a danger that posed a specific risk to Sinclair.

A danger is "particularized" if it is directed at a specific victim.  A survey of our cases makes that clear.  In *Grubbs I*, the state left a nurse alone with a violent offender, who assaulted her.  974 F.2d at 121.  In *Hernandez*, officers "shepherded [plaintiffs] into a violent crowd of protestors and actively prevented them from reaching safety."  897 F.3d at 1138.  In *Munger v. City of Glasgow Police Department*, officers expelled the inebriated plaintiff from a bar into the freezing night with nowhere to go, and he later succumbed to hypothermia.  227 F.3d 1082, 1086–87 (9th Cir. 2000).  In *Wood v. Ostrander*, troopers stopped a car, arrested the driver, and left the plaintiff passenger stranded in a high crime area in the middle of the night where she was subsequently raped.  879 F.2d 583, 590 (9th Cir. 1989).  In *Kennedy*, the plaintiff and her deceased husband were shot by their neighbor after a police officer notified the neighbor that the plaintiff had reported that the neighbor had molested their nine-year-old daughter.  439 F.3d at 1057–58.  And in *Maxwell v. County of San Diego*, a gunshot victim died after police officers prevented the ambulance from leaving for the hospital.  708 F.3d 1075, 1082 (9th Cir. 2013).  In each of those cases, the danger was particularized to the plaintiffs.  By contrast, in *Johnson*, where it was not, "[p]laintiffs voluntarily placed themselves in the midst of the crowd that subsequently became unruly."  474 F.3d at 640.

Here, Sinclair fails to allege that the City had any previous interactions with her son, directed any actions toward him, or even knew of her son's existence until he was killed.  Instead, she "alleged that the City left *all visitors to CHOP* in a much more dangerous position than it found them in."  Even construed in the light most favorable to Sinclair, her allegations demonstrate that the City-created

danger was a generalized danger experienced by all those members of the public who chose to visit the CHOP zone.

That distinguishes this case from *Hunters Capital LLC v. City of Seattle*, another CHOP case in which the district court held that plaintiffs could state a state-created danger claim. 499 F. Supp. 3d 888, 902 (W.D. Wash. 2020). Both parties point out that *Hunters Capital* involved plaintiffs who lived or owned businesses within the CHOP zone, significantly narrowing the class of persons exposed to the alleged state-created danger. *See id.* at 895–99. Those facts are more like *Hernandez*, where officers directed a discrete and identifiable group of protestors toward a dangerous mob, than like *Johnson*, where plaintiffs were among many who had attended a dangerous Mardi Gras festival voluntarily. While we offer no opinion on *Hunters Capital*, its facts are appreciably closer to meeting the particularity standard that our precedent requires than are Sinclair's allegations.

Sinclair points out that in *Huffman v. County of Los Angeles*, we noted that it is an open question in our circuit whether a plaintiff can bring a state-created danger claim when the danger was not particularized to a specific, known individual. 147 F.3d 1054, 1061 n.4 (9th Cir. 1998). She argues that as long as the state-created danger was particularized, a plaintiff may bring a claim even if the individual harmed was an undifferentiated member of the public. And here, she says that the City created the particularized danger of lawlessness.

Only one court, the Seventh Circuit, has held that the state-created danger need not be particular to a known plaintiff. In *Reed v. Gardner*, officers detained a sober driver, allowing his drunk passenger to take the wheel instead. 986 F.2d 1122, 1123–24 (7th Cir. 1993). The drunk

driver soon caused an accident farther down the highway. *Id*. The Seventh Circuit held that the state-created danger doctrine could apply because "the other motorists" in the area were "worse off with a drunk driver heading toward them than a sober one." *Id.* at 1125, 1127. At the same time, the *Reed* court reasoned that "[t]he dangers presented by drunk drivers are familiar and specific; in addition, the immediate threat of harm has a limited range and duration." *Id.* at 1127.

We need not definitively resolve whether to adopt the Seventh Circuit's minority rule showcased in *Reed* because it would not change the result. Here, the alleged dangers in CHOP were of unchecked lawlessness and rampant crime affecting everyone. Those dangers on this record clearly reflect the City's shocking contempt towards its promise to citizens that "[t]here shall be maintained adequate police protection in each district of the City." Seattle, Wash., City Charter art. VI, § 1. Likewise, individual city officials openly flouted their oath to "support . . . the Charter and ordinances of The City of Seattle." *Id.* at art. XIX, § 4. But the dangers alleged are neither specific, nor immediate, nor of limited range or duration. And Anderson's shooting was not as directly or necessarily correlated to the danger posed by uncontrolled lawlessness as a drunk-driving victim's injuries are to the danger of letting an intoxicated person get behind the wheel. Indeed, Anderson's encounter with Long, with whom he had "a history of antagonism," is a significant chink in the causal chain.

In sum, while the City created an actual danger of increased crime, that danger was not specific to Anderson or Sinclair.[4]  Thus, Sinclair's § 1983 claim fails.

*\*\*\**

The City's conduct here was egregious.  But because the City's actions were not directed toward Anderson and did not otherwise expose him to a specific risk, the connection between Sinclair's alleged injuries and the City's affirmative actions is too remote to support a § 1983 claim.  It is at the ballot box, then, that Sinclair and other Seattleites must hold the City accountable for their deliberately indifferent actions.

**AFFIRMED.**

---

[4] Sinclair also asserts that, with discovery, she would adduce testimony that her young, special needs son was especially vulnerable to the City's public comparisons to popular music/cultural events and promises of safety.  She may also be able to access City officials' missing text messages or benefit from adverse evidentiary inferences if they have been destroyed.  Even so, she still could not state a claim.  Even if her son was particularly susceptible to the City's misrepresentations, the danger of attracting special needs youth with statements about music and safety is not the sort of "familiar and specific" danger that is found by unleashing a drunk driver on the road.  Nor is it similarly limited in range or duration.

R. NELSON, Circuit Judge, concurring:

We have created a split with other circuits by recognizing a substantive due process right to the companionship of one's adult children.  Perhaps not purposefully; but we are bound by those prior holdings.  And had we fully considered the issue, we likely would not have recognized such a right.  Since Sinclair's claim depends on this right, had we not been bound by our precedent to hold otherwise, we should have affirmed the district court's dismissal of this case on that alternative ground alone.

The recognition of a constitutionally protected right to the mere companionship of one's children is a creature of the circuit courts.  The Supreme Court has never recognized such a right.  When the Supreme Court has recognized constitutional protections of the parent-child relationship, those protections have been concerned with the right to retain custody of minor children and the right to make decisions about raising them.  *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 396–99 (1923) (identifying the right to "establish a home and bring up children"); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder").  Never has the Supreme Court recognized as protected the emotional bond between parent and child without more, regardless of whether that child is a minor or an adult.

Not just that.  The Supreme Court has admonished that we must be wary of recognizing new substantive due process rights "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences" of judges.  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

Before recognizing a substantive due process right, the Court requires "a careful description" of the asserted right and then a determination that it is "deeply rooted in this Nation's history and tradition." *Id*. at 720–21 (citations omitted).

Other circuits have recognized a substantive due process right to the companionship of a minor child. But none have extended that right to an adult child. And most have rejected such an extension. In *McCurdy v. Dodd*, the Third Circuit stated that it would be a "serious mistake . . . to extend the liberty interests of parents into the amorphous and open-ended area of a child's adulthood." 352 F.3d 820, 829 (3d Cir. 2003). And in *Robertson v. Hecksel*, the Eleventh Circuit found no support for an extension of a parent's substantive due process rights to adult children in Supreme Court precedent and "decline[d] to further expand the substantive protections of the Due Process Clause." 420 F.3d 1254, 1260 (11th Cir. 2005).

We, unfortunately, have not. As detailed in the majority opinion, we have held implicitly that parents have a constitutional right to the companionship of their adult children, even after *Glucksberg*. *See, e.g.*, *Porter v. Osborn*, 546 F.3d 1131, 1132 (9th Cir. 2008). In a pre-*Glucksberg* decision, the Tenth Circuit took a similar position, without the type of analysis that *Glucksberg* would require. *See Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1190 (10th Cir. 1985).

Had we given the question due consideration, I do not think we would have recognized Sinclair's asserted right here. As the Third Circuit reasoned, it is too amorphous. Is the right limited to young adult children who still live with their parents? Or would it extend to the relationship between an 80-year-old father and his estranged 50-year-old son?

These uncertainties illustrate the difficulty in creating constitutional protections over broad abstractions. The Supreme Court has accordingly limited such protections to concrete circumstances in which the contours of the right have been historically clear.

Nor is it even necessary that Sinclair's companionship interest in her son be constitutionally protected for those interests to be vindicated. In overturning a prior ruling recognizing a substantive due process right to the companionship of one's adult child, the Seventh Circuit reasoned that "[a]ffording plaintiffs a constitutional due process right to recover against the state in these circumstances would create the risk of constitutionalizing all torts against individuals who happen to have families." *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005), *overruling Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984). Anderson's estate has already sued and settled with the City. And Sinclair or others harmed by his death may be able to bring state tort claims against the City. So while Sinclair may achieve justice for her son, the Due Process Clause is not the way to do so. Such rights should remain a creation of state law. *See Tabares v. City of Huntington Beach*, 988 F.3d 1119, 1122 (9th Cir. 2021) (explaining that the U.S. Constitution and state common law are "two distinct legal frameworks").

In sum, there is no good reason why we should even reach the merits of Sinclair's state-created danger claim. In establishing the right on which her claim depends, our precedent failed to engage in the proper analysis required by *Glucksberg* (or really any analysis at all). Had we done so, we should have reached the conclusion that our sister circuits already have: There is no constitutional right to recover for

the loss of her companionship with her adult son.  We should correct our prior erroneous precedent en banc.